UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 17-20215-CR-SCOLA

_____

UNITED STATES OF AMERICA

v.

JUAN P. GRANDA,

    Defendant.
_____

## RESPONSE IN OPPOSITION TO
## MOTION TO REVOKE PRE-TRIAL DETENTION ORDER

    The United States hereby files this Response in Opposition to Defendant Juan P. Granda's Motion for Revocation of Pre-Trial Detention Order and to Set Appropriate and Reasonable Bond (DE41) and states the following in support thereof.

### INTRODUCTION

    The instant motion seeks to revoke Magistrate Judge Andrea M. Simonton's order of pretrial detention. In the motion, Granda asserts that Judge Simonton did not correctly consider Granda's personal characteristics and, therefore, did not fully weigh the § 3142(g) factors in ordering his detention.

    The United States opposes the motion. Judge Simonton specifically considered Granda's personal characteristics, which weigh strongly in favor of detention. Judge Simonton specifically considered the fact that Granda is an Ecuadorian citizen by birth, has an Ecuadorian passport, has family in Ecuador, has traveled to Ecuador repeatedly, spent last Christmas in Ecuador, owns land in Ecuador, has bragged

1

about moving money to Ecuador and building a cabin there and acknowledged that Ecuador has no extradition to the U.S., and the fact that Granda is unemployed, unmarried, has no children, no permanent residence in the U.S., has travelled and lived extensively throughout Latin America, was most recently living in Colombia immediately prior to his arrest, has an admitted cocaine addiction, and has made false statements to law enforcement.

Judge Simonton also correctly weighed the nature of the offense and strength of the evidence, and specifically that Granda is charged with a multi-billion-dollar gold international money laundering conspiracy; facing a guideline sentence well above the twenty-year statutory maximum; and that the "weight of the evidence is strong"—evidence which includes Granda's own statements bragging about smuggling money and gold across international borders.

Together, the factors overwhelmingly weigh in favor of detention, and Judge Simonton correctly ordered that Granda be detained.

## BACKGROUND FACTS

Granda is charged along with two co-conspirators in a single-count Indictment with conspiracy to commit money laundering in violation of Title 18, United States Code, Section 1956(h) (DE12). Granda was initially charged by criminal complaint and arrested on March 15, 2017. (DE3 & DE7).

On March 20, 2017, Judge Simonton held a pre-trial detention hearing (DE32 (Transcript)). At the hearing, the United States moved for pre-trial detention based on risk of flight and presented both the facts of the criminal complaint and the proffered testimony of an FBI special agent as a basis for the detention.

**(1)     Government's Evidence of Risk of Flight**

At the hearing, the Court was made aware that from January 2013 through March 2017, Granda participated in a multi-billion-dollar international gold money laundering conspiracy; that the statutory maximum sentence is 20 years' imprisonment, and that the guideline sentence is at or near life imprisonment (DE3 & 32).

More specifically and as set forth in the criminal complaint, beginning around 2013, in connection with his employment as a salesperson for gold refinery NTR Metals, Granda intentionally promoted illegal gold mining, gold smuggling, foreign bribery, and foreign narcotics trafficking by purchasing gold from businesses and individuals involved in these criminal activities, knowing that the illegal gold mining, smuggling, and money laundering were integral to the criminal activity (DE3).

Throughout the time of the conspiracy illegal gold mining, gold smuggling, and gold money laundering were well-known problems in Peru and elsewhere in South America. Rather than work to avoid purchasing any illegally sourced gold, Granda and his co-conspirators conspired to increase their profits by knowingly purchasing gold through and with foreign shell companies, smuggling routes, false statements to U.S. customs authorities, foreign bribery, and from individuals known to Granda to be involved in illegal gold mining and narcotics trafficking activities (DE32, p.7).

Granda promoted these activities for his own profit; the more gold Granda purchased, the more money he made, both in commissions from NTR Metals and kickbacks. NTR Metals imported several billion dollars' worth of gold from Latin

America from 2012 to 2015 all of which was organized by Granda and his co-conspirators (DE32, p.8).

Granda spent a significant portion of the conspiracy travelling in Latin America, and lived in Peru for some time as the director of operations for NTR Metals (DE32, p.10).

From September to November of 2013, Granda was in charge of physically receiving and testing gold in Peru and, then, shipping the gold to NTR Metals in Miami. Id. Granda is estimated to have physically received tested and touched over 200 million worth of gold in those three months alone. Id.

The evidence of the conspiracy is strong and includes statements of cooperating co-conspirators, one of whom explained that Granda was specifically aware of foreign bribes being paid to smuggle gold and that Granda received cash kick-backs in Peru in exchange for his role in arranging gold laundering transactions. The evidence also includes Granda's own statements where he brags and admits to being an international gold smuggler, purchasing illegal gold, smuggling a million dollars across the border of Bolivia, and dealing with individuals connected to narco-trafficking (DE3).

Granda played a central role in the conspiracy.  Granda himself organized front companies and sophisticated mechanisms for laundering gold without alerting his employer's anti-money laundering program (DE32, p. 11). Granda received unaccounted for cash kickbacks in Peru for this operation. (DE32, p. 12). Granda is also known to have instructed at least one gold supplier to change an anti-money laundering compliance application so as not to specify where gold was coming from.

4

(DE32, p. 12). Granda is further known to have traveled throughout Peru, including illegal mining epicenter of Madre de Dios and the City of Puerto Maldonado where he would visit and conspire with gold sources in the jungles of Peru (DE32, p. 10).

Granda has strong foreign ties, unaccounted for assets, and few U.S. ties. Granda is an Ecuadorian citizen by birth, with an Ecuadorian passport (DE32, p.16). Ecuador is not known to extradite its own citizens. Granda owns property in Ecuador, has family in Ecuador, and spent the previous Christmas holiday in Ecuador (Pre-Trial Services Report & DE32, p.16-17). In WhatsApp chats with associates, Granda has explained that he was moving money to Ecuador and acknowledged the specific fact that Ecuador has no extradition to the U.S. (DE32, p.16).

Granda is fluent in Spanish, has traveled extensively in Latin America dozens of times since 2013, and was living in Colombia for several months until his travel to the U.S. immediately prior to his arrest (DE32, p.16).

Granda has no residence in the U.S., and per one family member stays with her "when he is in town" (DE32, p.57).

According to the pretrial services report, Granda admitted to abusing cocaine, but a day earlier in a post-*Miranda* interview, Granda falsely declared that he had never in his life tried cocaine.

### (2) Granda's Personal Characteristics Evidence

At the hearing, Granda presented substantial evidence by way of proffer regarding his personal characteristics, which were considered by Judge Simonton. In response to Judge Simonton's request that Granda make whatever argument

5

he wanted to in terms of "ties to the community" or "anything else you may want me to consider," Granda's attorney proffered the following regarding Granda's character and ties to the community:

> In terms of Mr. Granda, he was born in Ecuador because both of his parents -- excuse me -- in Ecuador because both of his parents were from there.
>
> His mother moved to the United States with her family in 1967. They came here fully documented with legal papers.
>
> His mother before he was born, of course, went back to Ecuador and met her husband. That was in 1979.
>
> She had two boys in Ecuador, which is Mr. Granda's full brother. He was in the United States Air Force for eight years, honorably discharged.
>
> His family, his parents, got divorced and Mr. Granda moved with his -- well, excuse me -- let me back peddle. The family moved here in 19 -- Mr. Granda was born in 1982 in Ecuador. The family moved back to Miami in 1986.
>
> Okay. And the mother purchased a house in Cutler Bay in 1988. She has owned that home up until today and still owns it. She became a single mother.
>
> The father went back to Ecuador where his family has land. That's the land mentioned that Mr. Granda has disclosed to the pretrial. It's his paternal grandmother's land. They have a farm with about 70 acres over there. It has been in the family for, I think, a couple -- if not more -- generations.
>
> As part of the divorce decree, they agreed that parents agreed that he could go and the siblings could go and spend time with the father's family in Ecuador in the summers, which they did when they were younger. The father has since passed. He died of a massive heart attack.
>
> Juan has a sister, a younger sister who was born in the United States. So she is a natural born citizen. The rest of his family are citizens naturalized.
>
> Mr. Granda became a naturalized citizen when he was 16 years old. He had nothing to do with Ecuador, or traveling around the world, or

6

to Latin America in any way, shape, or form. There might have been a vacation. I don't want to misspeak, but it is very rare.

Juan went to elementary school in Cutler Bay. He went to Whispering Pines which is in Cutler Bay. He graduated from there in 1993. He, then, went on to Centennial Middle School, which is down in Cutler Bay, the natural progression of schools. He graduated from there in 1996.

From there he went to Coral Reef High School, which is down in Cutler Bay, but he was accepted to the magnet school because of his grades, his high grades. And apparently it is rated one of the best schools in the country, the magnet portion of Coral Reef.

He studied business academy and finance and he graduated from there in 2000. He got a Bright Futures scholarship or a partial scholarship to Florida State. He was offered a full scholarship to a school in Chicago, but he chose to go to Florida State. He was given a partial scholarship. He studied international business and finance and graduated in 2004.

From there, he went to HSBC where he worked for several years. And when the recession hit -- he actually was promoted and was given his own branch in the Doral area or excuse me, I think it was in the Miami Lakes area.

The recession hit and he no longer had a job because they closed that branch. He immediately got hired at Kaplan University and he worked his way up the ranks there. And while he was there, he got his MBA. He got his MBA in 2011 or 2012, I am not sure of the exact date.

His family, his mother has always lived at that house and still does today. When he was recruited from Kaplan University to go work for NTR, he had never been in the precious metals business. He has never been in the gold business.

He was flown to Dallas for training for a couple of weeks. In fact, just last year the Elemetal, the main company, flew him up and took him to -- he's a Dallas Cowboys fan. They took him around the stadium. They've taken him to numerous games in their skybox based on his performance for him working in Peru. When he was hired by NTR a couple of months after his training and they sent him to Peru he has -- just because he speaks Spanish and he was willing to go and they sent him.

And he was there and he relied on his compliance people, the

training he received by NTR, and Elemetal the beginner company. And the only reason he was in Peru is for that job. The company paid for his living expenses while he was there or reimbursed most of it for his apartment.

When the Government authorities were investigating NTR and NTR decided to shut the operation down, he was brought back home last year for a couple of months and he stayed at his mother's house there.

He still has all his furniture for when he did live on his own from previous jobs at Kaplan University and HSBC. He has all his furnishings in a warehouse here in Miami that he keeps. But when he would come home from Peru, he would stay with his mother and on occasion he would stay with a friend in Miami, though.

So after he came home and lived with his mother for a few months, NTR decided they were going to send him to Colombia and that is the only reason he ever went to Colombia or lived in Colombia. He lived there for two months.

\* \* \*

… He has no connections to Colombia whatsoever.

He does have relatives from his paternal side in Ecuador. The only reason he even has an Ecuadorian passport … It is because when he moved -- and I think the dates will show it -- when he moved there for the company to travel throughout Latin America there were many reasons that he did it; visa, safety.

[Y]ou become somewhat of a target over in Latin America with the U.S. Things are cheaper there at many places and facilities if you are not a tourist and you can show a Latin American passport or an Ecuadorian passport in Ecuador.

\* \* \*

[W]when he comes home to Miami, he goes to the same barber since he was a kid. And that barber moved from Cutler Bay to Fort Lauderdale and he drove to Fort Lauderdale for his haircut the other day.

He owns a car here. That was his car before he was hired he go to work for NTR. I am not going to represent it is worth millions of dollars. I don't know what the report says, but it's an older car. I believe it is $8,000 or $10,000, but he owns it.

> That's the car that he drive's around Miami when he's here when he wasn't working overseas for NTR. That is the car that he drove to go get arrested in to his mother's home that he lived at since he was six years old.
>
> So his ties are very strong here. They're very strong and that's what his ties are. He just happened to be born and his father in Ecuador because both of his parents were from there.
>
> He has no children of his own. His sister, whom he is extremely close to, has a child and Mr. Granda is the godfather to him.
>
> \* \* \*
>
> His aunt flew in from North Carolina, which is technically South Carolina, the moment she found out he was arrested. That's how close he is. They don't live here, but that's his mother's sister and she flew in.
>
> And because of his character, Your Honor, he is also the godfather of her daughter. And he is godfather to another friend's child as well, but he has never ever been in trouble before in his life. …

(DE32, pp. 61-71).

After the lengthy proffer of Granda's personal characteristics for Judge Simonton's consideration, Granda went on to propose a percentage bond to be co-signed by family and friends.

### (3) Judge Simonton's Findings and Ruling

After considering all of the relevant evidence and factors, Judge Simonton held that Granda posed a serious risk of flight and should be detained. At the hearing, Judge Simonton specifically found that:

> [T]here is substantial evidence that [Granda] was involved in importing into the United States illegally mined gold and also smuggling to other countries gold, which was then to be imported into the United States. … [T]he weight of the evidence is significant. The potential penalty is quite large because it is a money laundering charge. … [Granda] has strong, strong foreign ties and I think that that is really the overriding factor in this case.

9

(DE32, pp 87-89).

Additionally, in her written order, Judge Simonton held that following factors supported detention, including several personal characteristics of Granda: (1) "weight of the evidence is strong," (2) "subject to lengthy period of incarceration if convicted," (3) "<u>history of alcohol or substance abuse</u>," (4) "<u>lack of stable employment</u>," (5) "<u>lack of stable residence</u>," and (6) "<u>significant family or other ties outside of the United States</u>" (DE25) (emphasis added for personal characteristics).

Finally, Judge Simonton explained the following in her order, much involving Granda's personal characteristics:

> The Defendant, <u>a dual U.S. and Ecuadorian citizen</u>, is charged with a large scale money-laundering conspiracy spanning the Southern District of Florida and several countries in Latin America. At the time of the detention hearing, the Defendant was charged in a Criminal Complaint; subsequently an Indictment was returned. The evidence against the Defendant is sufficiently strong, and his sentencing exposure sufficiently high, to create a serious risk of flight. In addition, numerous other factors support this risk. The Defendant has <u>traveled extensively to Latin America over the last few years, and has lived there for significant periods of time</u>. The Defendant was <u>most recently living in Colombia for several months</u>. The Defendant is an <u>Ecuadorian citizen, has family in Ecuador, has recent travel to Ecuador, owns property in Ecuador, and has spoken of moving money to Ecuador and previously acknowledged its lack of extradition in at least one of those discussions</u>. The Defendant has acknowledged participating in the movement of smuggled gold across borders in Latin America and into the United States, and in the smuggling of money across borders. The Defendant's conspiracy included the falsification of information provided to customs and the bribery of foreign officials. The <u>Defendant is unemployed, unmarried, and has no children</u>. Finally, there are alleged co-conspirators who would have an interest in supporting the Defendant's flight so as to avoid his pressure to cooperate.

(DE25) (emphasis added for personal characteristics).

### (4) Judge Patrick A. White's Detention of Granda's Co-Conspirator

About two weeks later, on April 7, 2017, Magistrate Judge Patrick A. White, held a detention hearing for Granda's co-defendant, Samer H. Barrage, after Barrage's arrest in, and expulsion from, Colombia.

In ordering that Barrage be detained pending trial, Judge White also found that the nature of offense supported detention and that the strength of the evidence was "impressive" (DE45). Further, Judge White found that: "In the early morning hours of March 20, 2017 [(the morning of Granda's detention hearing)], defendant BARRAGE fled to Colombia, knowing his arrest was imminent" (DE 45).

## DISCUSSION

Judge Simonton correctly considered the § 3142(g) factors in finding by a preponderance of the evidence that "no condition or combination of conditions of release will reasonably assure the defendant's appearance as required." (DE25). Judge Simonton considered not only the nature and weight of the evidence, but also Granda's personal characteristics.

Judge Simonton's ruling was exactly correct. All three § 3142(g) factors individually support detention and, together, overwhelmingly so.

### (1) Nature of Offense Charged

The nature of the offense overwhelming supports detention. Granda is charged with a multi-year, multi-billion dollar, international gold smuggling and laundering conspiracy. Granda dealt not only with large sums of money and gold across Latin America, he lived there, made connections with dozens of smugglers and other criminals in foreign countries with substantial assets and incentives to help him

11

flee, participated in bribing foreign officials, learned to avoid detection and falsify documents, employed mules, received cash kickbacks in foreign countries, and smuggled gold and cash across borders. Clearly, the nature of this crime creates a tremendous risk of flight; indeed, it is hard to imagine a criminal scheme with facts that could create a greater risk.

Further, Judge Simonton correctly noted that "there are alleged co-conspirators who would have an interest in supporting the Defendant's flight so as to avoid his pressure to cooperate" (DE 25). Contrary to Granda's argument that this was an "unsubstantiated" claim, courts in this district have long held that money laundering violations carry heightened risks of flight for this type of reason:

> "money laundering" is an integral part of the narcotics business. The same factors which create an unusually high risk of flight in narcotics offenses and which form the basis for the statutory presumption are present here-the business is extremely lucrative and those involved have established substantial ties outside the United States. Thus, persons involved in money laundering, just as those involved in narcotics trafficking, have the resources and foreign contacts to escape to other countries to avoid prosecution.

United States v. Botero, 604 F. Supp. 1028, 1033 (S.D. Fla. Mar. 14, 1985), *aff'd mem.* 853 F.2d 928 (11th Cir. 1988).

**(2) Weight of the Evidence**

The weight of the evidence is strong. Granda admits to and describes the conspiracy in his own words in WhatsApp chats with his co-conspirators and others, as set forth in detail in the criminal complaint. Granda literally speaks about smuggling gold, smuggling cash, employing mules, buying gold under the table, and avoiding wiretaps. Granda even hashtags his conduct: #vice. In addition, at least

12

two witnesses implicate Granda and his co-conspirators as knowing participants in the illicit gold trade. And all of this is corroborated by the actual volumes and patterns of gold imports from Latin America organized by Granda and his co-conspirators.

Indeed, Judge Simonton found repeatedly that "there is substantial evidence," "the weight of the evidence is significant," and the "weight of the evidence is strong." (DE25 & DE32). While Granda correctly points out in his Motion that Judge Simonton noted it was "not the strongest case that [she has] ever seen," she found it to be a "strong" case with "significant evidence" and more than strong enough to warrant detention. And a second judge, Judge White, also considered the same evidence to be "impressive" and strong enough to warrant the pretrial detention of Granda's co-conspirator Barrage, who Judge White found had fled to Colombia the morning of Granda's detention hearing (DE 33, 39 & 45).

Clearly, the weight of the evidence further supports detention.

**(3) Granda's History and Characteristics**

Granda's history and characteristics also support detention.

First, Granda has strong foreign ties. Granda is an Ecuadorian citizen by birth, has travelled under an Ecuadorian passport, has family in Ecuador, spends holidays in Ecuador including last Christmas, owns property in Ecuador, has spoken of building a cabin in Ecuador, has acknowledged moving money to Ecuador, and has specifically acknowledged in private conversation relating to moving money to Ecuador that Ecuador has no extradition to the U.S. In addition, most recently, Granda was living in Colombia, and has traveled all over the Latin America in

13

recent years and lived in Peru. Granda is fluent in Spanish, has criminal contacts in Latin America, and experience moving across borders without detection.

Second, Granda has weak U.S. ties. He is not married, has no children, is unemployed, and has no permanent residence in the U.S.—according to one family member, Granda merely stays with her "when he is in town."

Third, Granda has access to substantial and unaccounted for financial resources. Granda declared a net worth of approximately $250,000 to pre-trial services, and is also known to have received cash kickbacks in Peru and moved money to Ecuador, all of which is unaccounted for. In addition, Granda is connected to numerous co-conspirators in Latin America with access to 100s of millions of dollars and an interest in Granda not feeling pressured to cooperate against them.

Finally, Granda admitted to having a cocaine habit, despite having falsely claimed, among other things, to federal agents that he had never before tried cocaine.

Granda's argument that Judge Simonton failed to consider his personal characteristics is wrong. The personal characteristics outlined above where explicitly part of her ruling and finding of risk of flight. Moreover, the facts of Granda's biography, which Granda now claims Judge Simonton failed to consider, were all heard and considered by her <u>at length</u> as outlined above. And none actually establishes any real and current ties to the U.S. or the Southern District of Florida or any other substantial reason to ignore the overwhelming evidence of Granda's serious risk of flight.

As with the other § 3142(g) factors, Granda's personal characteristics support detention in this case. And, together, the factors overwhelmingly support detention.

WHEREFORE the United States respectfully requests that the Court deny the Motion for Revocation of Pre-Trial Detention Order and to Set Appropriate and Reasonable Bond.

                Respectfully submitted,

                BENJAMIN G. GREENBERG
                ACTING UNITED STATES ATTORNEY

      By:  */s/ Francisco R. Maderal*
            Francisco R. Maderal
            Assistant United States Attorney
            Fla. Bar No. 41481
            99 Northeast 4th Street
            Miami, Florida 33132-2111
            francisco.maderal@usdoj.gov
            Tel: (305) 961-9169
            Fax: (305) 530-7976

**CERTIFICATE OF SERVICE**

  **I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed via CM/ECF on April 18, 2017.

              _/s/ Francisco R. Maderal_
               Francisco R. Maderal