UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 17-CR-20215-SCOLA(s)

UNITED STATES OF AMERICA

v.

SAMER H. BARRAGE and
JUAN P. GRANDA,
    a/k/a "Flecha,"

    Defendants.
_____/

## FACTUAL PROFFER

The United States of America and JUAN P. GRANDA, a/k/a "Flecha," (the "defendant") stipulate that if this matter were to proceed to trial, the Government would prove the stated facts beyond a reasonable doubt:

### The Charged Money Laundering Conspiracy

1.     From January 2013 through March 2017, Samer H. BARRAGE, Renato RODRIGUEZ, Juan GRANDA, and others conspired to purchase billions of dollars of criminally derived gold from Latin America and the Caribbean, which they believed to be or which in fact were the proceeds of unlawful criminal activities (including illegal mining, foreign bribery, foreign smuggling, foreign narcotics trafficking, and the entry of goods into the United States by false means and statements), through their employer ELEMETAL LLC, a dealer in precious metals operating in the Southern District of Florida and "financial institution," as defined in Title 18, United States Code, Section 1956(c)(6)(A), in violation of Title 18, United States Code, Section Sections 1956(h) and 1957.

2. In addition, BARRAGE, RODRIGUEZ, GRANDA, and others conspired to promote criminal activities (including illegal mining, foreign bribery, foreign smuggling, foreign narcotics trafficking, and the entry of goods into the United States by false means and statements) by transmitting billions of dollars of wire payments from the United States to Latin America and the Caribbean to promote the delivery of additional criminally derived gold, in violation of Title 18, United States Code, Section Sections 1956(h) and 1956(a)(2)(A). Furthermore, BARRAGE, RODRIGUEZ, and GRANDA each traveled dozens of times in interstate and foreign commerce to promote and carry on this conspiracy, in violation of Title 18, United States Code, Section 1952.

3. Dozens of other individuals and entities both in and out of the United States were involved in the money laundering conspiracy, including, but not limited to:

   a. foreign "collectors" who aggregated gold from illegal miners and smugglers for sale to ELEMETAL through front companies;

   b. foreign and domestic "clients" who created front companies, corresponding bank accounts, fake invoices, and false mining paperwork, all designed to conceal the illegal nature and source of the gold and establish front accounts with ELEMETAL in order to receive wire payments for the gold; and

   c. foreign and domestic customs brokers and freight forwarders who helped to bribe foreign government officials in order to release gold for export and assisted in preparing and submitting false documents for export and import.

4. <u>Illegal Gold Mining</u>. Illegal gold, mined in violation of foreign law, is a significant problem throughout Latin America and particularly in Peru, where illegal mining is responsible for the devastation of large swaths of rainforest. Because illegal mining occurs in remote jungle areas, it is difficult to police and involves organized criminal groups who smuggle gold along the

same international routes as narcotics. The Madre de Dios region and the city of Puerto Maldonado, both in Peru, are well-known epicenters of illegal gold mining and smuggling activities.

5.     The international gold trade has become a common method for the laundering of illegal mined gold, narcotics and other criminal proceeds. Criminals frequently trade illegal gold through illicit shell or front companies using false or incomplete documents.  The gold is often smuggled through third-party countries and then sold to refineries in the United States, in an effort to hide the true source, ownership, and origin of gold from foreign and United States law enforcement.

6.     Illegal gold mining in Peru is a crime against the Republic of Peru, under legislative Decree 1102, Article 307-A, punishable by up to eight years in prison. Accordingly, illegal mining in Peru, is a crime with respect to which the United States would be obligated to extradite the alleged offender under the multilateral United Nations Convention Against Transnational Organized Crime, and is therefore a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(B)(vi).

7.     Illegal Gold Smuggling. Smuggling of gold out of Peru is a separate crime against the Republic of Peru, under law No. 28008, Chapter 1, Article 1, punishable by up to eight years in prison. Accordingly, the smuggling of gold in Peru, is also a crime with respect to which the United States would be obligated to extradite the alleged offender under the multilateral United Nations Convention Against Transnational Organized Crime, and is therefore a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(B)(vi).

8.     Foreign Bribery. Bribery of foreign government officials is frequently used to facilitate the movement of illegal gold in and out of foreign countries. Bribery of customs

(SUNAT) officials in Peru in order to obtain the release of gold for export is a crime against the Republic of Peru, and is therefore a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(B)(iv).

9.  <u>Entry of Goods by Means of False Statements</u>. False documents, statements, and fraudulent practices are frequently used to gain entry of illegally mined gold into the United States, for instance, by manufacturing false invoices or making false statements as to the country of origin in connection with customs declarations. Entry of goods by means of false statements is a violation of Title 18, United States Code, Section 542, and is therefore a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(D).

10. <u>Foreign Narcotics Trafficking</u>. Narcotics trafficking is a crime against the Republic of Peru, and is therefore a specified unlawful activity under Title 18, United States Code, Section 1956(c)(7)(B)(i).

## BACKGROUND OF THE CONSPIRACY

11. Around 2012 and 2013, ELEMETAL hired BARRAGE, RODRIGUEZ, and GRANDA to find and buy as much gold as possible in Latin America and the Caribbean. As a precious metals refinery, ELEMETAL's profits depended on the volume of gold it was able to buy, refine, and resell. ELEMETAL incentivized BARRAGE, RODRIGUEZ, and GRANDA to purchase as much gold as possible with volume-based commissions.

12. BARRAGE, RODRIGUEZ, and GRANDA negotiated terms with potential ELEMETAL "clients." The primary term of negotiation was the price ELEMETAL would pay for the gold, expressed as a percentage of the spot price for gold, e.g. 99.6%. Once the terms were agreed, the clients would ship gold from Latin America or the Caribbean to ELEMETAL in Miami. ELEMETAL would then evaluate the gold and make wire payment to the client overseas.

13. Recognizing the high risk of gold-based money laundering, federal law requires precious metals dealers such as ELEMETAL to "develop, implement and maintain an anti-money laundering program reasonably designed to prevent [ELEMETAL] from being used to facilitate money laundering and the financing of terrorist activities." Accordingly, before gold could be purchased by BARRAGE, RODRIGUEZ, or GRANDA for ELEMETAL, the client needed to be approved by ELEMETAL's Anti-Money Laundering ("AML") Compliance Officer

14. Although ELEMETAL did maintain an AML program and an AML Compliance Officer, the program did not prevent money laundering within ELEMETAL. Rather, BARRAGE, RODRIGUEZ, GRANDA, and others used the ELEMETAL AML Program as a fraudulent basis for deniability of their actions in furtherance of conspiracy.

### Evolution of the Conspiracy

15. In early 2012, BARRAGE and RODRIGUEZ, who were hired before GRANDA, purchased relatively small amounts of gold for ELEMETAL from the Caribbean and South America all the while trying to enter the lucrative Peru gold market.

16. Ultimately, BARRAGE, RODRIGUEZ and then GRANDA entered the Peru gold market where they purchased almost a billion dollars of gold there for ELEMETAL in 2013 by conspiring to purchase gold they knew was criminally derived.

### P.F. and Peru 2012 to 2013

17. In 2012, BARRAGE was contacted on behalf of the Peruvian company B.I., S.A.C., and its principal P.F. In August 2012, BARRAGE attempted to open an account at ELEMETAL for P.F. and B.I., which was then selling gold to another Miami-based refinery.

18. P.F. was expected to sell 5,000 ounces (approximately 141 kilograms) per week of 92% gold—a large and potentially highly profitable volume for ELEMETAL, but ELEMETAL's

AML Compliance Officer rejected the account once he learned of P.F.'s involvement because P.F. was known to be a gold money launderer.

19. In an August 6, 2012 email, the AML Compliance Officer rejected the account because of P.F.'s involvement. Importantly, the AML Compliance Officer directly warned BARRAGE and at least four ELEMETAL executives that criminal gold mining is a problem in Peru, that "Peruvian 'informal' gold is smuggled to Bolivia, Ecuador and Colombia" and that "We need to be extremely careful going forward."

20. In a later November 2012 email, the AML Compliance officer sent BARRAGE and RODRIGUEZ a blurb from the Peruvian newspaper "La Republica" explaining that P.F. was under investigation for money laundering and narco-trafficking. The article was sent to RODRIGUEZ in connection with an AML investigation of a second Peruvian company submitted by BARRAGE and RODRIGUEZ, which was discovered to also have some connection to P.F..

21. Notwithstanding being told that P.F. was a money launderer and narcotics trafficker, BARRAGE, RODRIGUEZ, and eventually GRANDA, went on to purchase and profit from $400 million of illegally mined and smuggled gold from P.F. as part of almost a billion dollars in gold purchased from Peru in 2013.

22. In order to circumvent the AML Compliance Officer, BARRAGE, RODRIGUEZ, GRANDA, and others conspired to knowingly purchase illegally mined gold from P.F. through a series of front companies, bribery of foreign officials, and false U.S. Customs declarations, and to conceal these facts. More specifically:

    a. Beginning around November 2012, BARRAGE, RODRIGUEZ, GRANDA and others, began opening accounts at ELEMENAL for a series of Peruvian front

companies they knew to be controlled by P.F. which together shipped approximately $400 million of gold to ELEMETAL.

 b. BARRAGE, RODRIGUEZ and GRANDA knew that these P.F. front companies were selling illegally mined gold.

 c. BARRAGE, RODRIGUEZ and GRANDA knew that these P.F. front companies were consistently bribing Peruvian customs (SUNAT) officials in order to export and ship the gold to ELEMETAL.

 d. BARRAGE, RODRIGUEZ and GRANDA misled the AML Compliance Officer about P.F.'s control of these companies and their criminal activities.

 e. Later in 2015, BARRAGE, RODRIGUEZ and GRANDA provided false statements in connection with an insurance investigation relating to a claim made by ELEMETAL. In furtherance of this, BARRAGE, RODRIGUEZ and GRANDA met beforehand and coordinated their false statements to hide their knowing involvement with P.F. from investigators.

23. The conspiracy was not limited to P.F. or the P.F. companies in Peru. In 2012 and 2013, BARRAGE, RODRIGUEZ and GRANDA conspired to knowingly transfer hundreds of millions of dollars of criminally derived gold to ELEMETAL from other individuals and companies in Peru. Much of this involved illegal gold mining, foreign bribery, and false and fraudulent statements and documents delivered to U.S Customs.

24. In December 2013, Peru began to crackdown on the illegal gold trade and began seizing illegal gold shipments including gold destined for ELEMETAL. This affected ELEMETALS ability to purchase gold from Peru. Consequently, BARRAGE, RODRIGUEZ and

GRANDA shifted their focus to Peru's neighboring countries including Bolivia and Ecuador, where they knew Peruvian gold was beginning to be smuggled.

### Bolivia and Ecuador 2014

25. The flow of Peruvian gold through smuggling routes into Bolivia and Ecuador beginning in 2014 was obvious and well-known to persons involved in the Latin American gold trade. Total declared U.S. gold imports from Peru, which had spiked around $2.6 billion in 2013, sank to $740 million in 2014, while exports from Bolivia and Ecuador more than doubled from $878 million to $2.3 billion. This trend held true for ELEMETAL as well. ELEMETAL's declared U.S. imports from Peru sank from $980 million in 2013 to $79 million in 2014, while its imports from Ecuador and Bolivia more than quadrupled from $121 million to $606 million.

26. BARRAGE, RODRIGUEZ and GRANDA conspired to have this Bolivian and Ecuadorian gold sent to ELEMETAL knowing, that its true country of origin was Peru, and that the gold was being illegally mined and smuggled across the border in Peru and falsely declared to U.S. Customs as originating from Ecuador or Bolivia in order to gain entry into the United States.

27. In numerous WhatsApp chats among GRANDA, BARRAGE, and RODRIGUEZ, all three jokingly acknowledged and discussed their conspiracy to purchase illegally mined and smuggled gold, and specifically the smuggling of gold from Peru through Bolivia an Ecuador.

28. Moreover, BARRAGE and RODRIGUEZ were specifically aware that their largest "collector" in Ecuador was smuggling gold across the Peru border.

### Peru and Elsewhere 2014 and Beyond

29. The conspiracy involving Peru and elsewhere continued in 2014 and beyond.

30. For example, beginning in 2014 and continuing through 2016, with GRANDA in charge of Peru for ELEMETAL and BARRAGE and RODRIGUEZ's participation, the conspiracy

evolved to include the use of multiple front companies operating simultaneously and in parallel to avoid raising suspicion because of high volumes. Illegal gold providers would bring gold to GRANDA in Peru where it would be matched with false mining and other paperwork and exported through a front company under the account of a prep-approved third-party ELEMETAL client, which would then route payment to the original provider. These transactions also involved bribery of SUNAT officials.

[*remainder of page intentionally left blank*]

## PROPERTY INVOLVED IN THE CONSPIRACY

31. As a result of their participation in the conspiracy, BARRAGE and GRANDA received $1,307,759.37 and $466,422.76 in wages from ELEMETAL respectively.

32. In addition, the following property is traceable to the wages they received:

   a. As to BARRAGE:

   i. real property located at Malibu at Pacific Marlin in San Juan del Sur, Nicaragua;

   ii. real property located at 8460 SW 84 Terrace, Miami, Florida 33143;

   iii. real property located at 5300 NW 85th Avenue, #1610, Doral, Florida 33166;

   iv. The contents of Fidelity Investments 401k Account in the name of Samer Barrage, ending in 3927; and

   b. As to GRANDA:

   i. The contents of Fidelity Investments 401k Account in the name of Juan P. Granda, ending in 8760.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

Date: 9/5/17     By: _____
FRANCISCO R. MADERAL
ASSISTANT UNITED STATES ATTORNEY

Date: 9/5/17    By: _____
DANIEL RASHBAUM &
ALLISON GREEN
ATTORNEY FOR DEFENDANT

Date: 9/5/17    By: _____
JUAN P. GRANDA
DEFENDANT

10